NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

MAIN EVENTS PRODUCTIONS,
L.L.C. and NEW JERSEY SPORTS
PRODUCTIONS, INC.,

        Plaintiffs,

       v.

JEFF LACY, JOHN DOES (fictitious
entities) and RICHARD ROES
(fictitious entities),

        Defendants.

Civil No. 02-3028(DRD)

FILED

SEP 4 2002

AT 8:30 ____ 4:08 ___

WILLIAM T. WALSH
CLERK

OPINION

LAWRENCE B. ORLOFF, ESQ.
ORLOFF, LOWENBACH, STIFELMAN & SIEGAL, P.A.
101 Eisenhower Parkway
Roseland, New Jersey 07068

     and

PATRICK C. ENGLISH, ESQ.
DINES and ENGLISH
685 Van Houten Avenue
Clifton, New Jersey 07013
       Attorneys for Plaintiffs Main Events Productions,
       L.L.C. and New Jersey Sports Productions, Inc.

DAVID A. PICON, ESQ.
PROSKAUER ROSE LLP
One Newark Center
Newark, New Jersey 07102

JUDD BURSTEIN, ESQ.
JUDD BURSTEIN, P.C.
1790 Broadway

New York, New York 10019
    Attorneys for Defendant Jeff Lacy

**<u>Debevoise, Senior United States District Judge</u>**

This case, having been removed from the New Jersey Superior Court, is presently before

this court upon plaintiffs' application for a preliminary injunction.

The plaintiffs, New Jersey entities, are Main Events Production, L.L.C. ("Main Events")

and its parent company, New Jersey Sports Production, Inc. ("New Jersey Sports"). They will be

referred to collectively as "Main Events." Main Events is in the business of boxing promotion.

The defendant, aside from fictitious John Does and Richard Roes, is Jeff Lacy, a Florida resident

and a professional boxer and former Olympian. The present controversy arises out of Lacy's

termination of a promotion agreement entered into in November or December 2000 between

himself, Main Events and Lacy's Manager, Shelby Finkel Management, Inc.

A hearing on plaintiffs' application for a temporary restraining order was held on July 15,

2002. The application was denied and an evidentiary hearing on the application for a preliminary

injunction was scheduled to take place after a brief period to allow for discovery. During this

period each party moved for summary judgment, Main Events contending that the unambiguous

language of the promotion agreement precluded Lacy from terminating the agreement and Lacy

contending that the unambiguous language of the promotion agreement permitted him to

terminate it.

Deferring a ruling on the motions for summary judgment, I held the evidentiary hearing

on August 22 and 23, each side being given one day to present testimony. The principal issues

were the meaning of the pertinent agreement language, assuming it to be ambiguous, and

2

irreparable injury.

I. The Facts

The facts set forth herein are based upon uncontroverted statements contained in the parties' affidavits and uncontroverted Statements of Undisputed Facts submitted in support of the summary judgment motions, upon the testimony given at the evidentiary hearing and upon the exhibits which the parties have submitted.

In 1998 Lacy, while still an amateur boxer, was introduced to and became a close friend of a Tampa attorney, James L. Wilkes, Esq., a senior partner of the law firm of Wilkes & McHugh, P.A. Wilkes developed a deep interest in several boxers in addition to Lacy who were starting their fighting careers, assisting Lacy and them with equipment, travel expenses and counseling. Wilkes accompanied Lacy to his fights on a number of occasions, including the 2000 Olympic qualifiers in Tampa, the Olympic box-off in Connecticut and the 2000 Summer Olympics in Sydney, Australia. In Sydney Wilkes spoke with Gary Shaw and Kathy Duva, the surviving spouse of the founder of Main Events and its then principal. Since early 1996 Duva has been Chairman of the Board of Directors and since mid-1999 she has been Chief Executive Officer of the Company. In 1999 Duva recruited Shaw to be Main Events's Chief Operating Officer. Wilkes discussed with Duva and Shaw their interest in becoming involved with Lacy's boxing career. Shortly after the Olympics Lacy turned professional, and Wilkes entered into discussions with Main Events about its becoming Lacy's promoter.

Negotiations proceeded between Wilkes on behalf of Lacy and Patrick English, Esq., of the law firm of Dines and English on behalf of Main Events. These were the only two persons

3

who actually negotiated the agreement. They testified about these negotiations, and their testimony is in conflict in critical respects.

English testified that he prepared a draft of agreement which he sent to Shaw and Lacy's manager Shelly Finkel for comments. The draft included a paragraph 12 carried over from an earlier agreement drawn at a time when Main Events contemplated a public offering which could have resulted in Duva's departure from the organization. Paragraph 12 read:

> 12. PUBLIC OFFERINGS:
>
> It is expressly understood that nothing in this contract shall prohibit any public offering by PROMOTER, any joint venture entered into by PROMOTER, or any syndication sponsored by PROMOTER, provided that the present management team of PROMOTER continues to retain promotional control over the obligations imposed by this contract and remains fully liable hereunder. Except as set forth above, this contract shall not be assignable without the express written permission of all parties hereto.

According to English he discussed only numbers with Finkel and all other matters of substance awaited conversations with Wilkes. On November 21, 2000, after a telephone conversation with Wilkes, English FAXED the next draft to him. These followed several FAX drafts with written comments between English and Wilkes. The critical discussions took place in a face to face meeting of Wilkes and English on November 30 or December 1 at the Mandalay Hotel in Las Vegas on the occasion of the Vargas-Trinidad fight. These were lengthy discussions that took place in a public area with people coming and going.

At the outset Wilkes asked for a key-man provision so that Lacy could get out of the contract if Shaw were no longer with Main Events. English informed Wilkes that he could not agree to such a provision and that Main Events had a firm policy against key-man clauses. According to English all discussion of a key-man provision relating to Shaw ended at that point.

4

There followed a long discussion of Main Events's organization. English described the lawsuit in which Duva and Main Events were involved. Duva's deceased husband's relatives were seeking to seize the company from her. In English's opinion they had small chances of success. Then, according to English, Wilkes asked for a provision permitting Lacy to withdraw from the agreement if English, Duva and Shaw all left Main Events.

English did not wish to be named in the contract and ultimately, as a compromise, agreed to a provision that would allow Lacy to terminate if both Duva and Shaw were no longer with Main Events. According to English, English and Wilkes together worked out the language that appears in English's handwriting at the foot of page 11 of a draft of the agreement (Plaintiff Exh 4).

The agreed upon clause read:

> In the event that both Kathy Duva and Gary Shaw are no longer involved in the management of PROMOTER, FIGHTER may terminate this contract within fourteen (14) days of such event.

English had this language added to the paragraph which permitted public offerings or other specified reorganizations "provided that the present management team of PROMOTER continues to retain promotional control . . ." Formerly paragraph 12, the paragraph was renumbered 11 in the final draft of agreement.

Wilkes's testimony differs from that of English in critical respects with regards to the negotiations at the Mandalay Hotel. Having noted the public offering provisions of paragraph 12 (now 11), Wilkes opened the discussions by asking for a key-man provision as to Shaw, so that if Shaw left Main Events Lacy could terminate the agreement. According to Wilkes, English reacted in a hostile manner to this request and launched upon a lengthy discussion of Main

Events. In particular he described the litigation in which Duva's in-laws were seeking to wrest control of Main Events from her. Upon conclusion of his response English proposed a provision that if either he or Duva left Main Events Lacy could get out. Wilkes testified that he rejected that approach and suggested as a compromise a provision that if either Duva or Shaw should go Lacy could get out. According to Wilkes, English agreed to that proposal and drafted the language which appears in the final agreement without any participation on Wilkes's part.

In any event, after the changes were made the contract was executed in late November or early December 2000. It had an initial term of four years and spelled out in detail the obligations of each party and set forth the financial arrangements between them.

Lacy has done well under Main Events's sponsorship. He has had 10 wins and no losses and has been ranked #9 by the USBA and #14 by the IBF. As recently as June 8 Main Events placed Lacy on the undercard of the Lewis against Tyson bout where Lacy showcased for viewers on international television.

In late May or early June Shaw left Main Events. Duva remained as Chief Executive Officer. On June 14, relying on paragraph 11 of the promotion agreement, Timothy C. McHugh, Esq., on behalf of the Wilkes and McHugh law firm, faxed a letter to Duva stating that Lacy was exercising his paragraph 11 termination privilege effective immediately.

Main Events's attorney English responded on the same date by fax, advising McHugh that the notice of termination was ineffective, stating, . . . "the concept agreed to [by] you in paragraph 11 was that both Kathy [Duva] and Gary [Shaw] had to leave Main Events for the provision you cite to be effective." June 14 was a busy day, and McHugh faxed back a letter to English disagreeing with his contentions and stating . . ."we are moving forward with securing a

6

new promoter for Mr. Lacy."

At the time of the June 14 termination Lacy was training for a July 13 fight that Main Events had scheduled for him. He continued training for that event so that Main Events would not be harmed by reason of the termination. He did not communicate his availability to Main Events. By means of a June 17 fax English advised McHugh that: "Your letters make it clear that Mr. Lacy will not be fighting on the Main Events July 13 card. Main Events has therefore had to take steps to replace him on the card."

Following these events plaintiffs instituted this lawsuit in the New Jersey State Court. They seek an order i) enjoining Lacy from entering into any promotional contract with any entity other than Main Events; ii) voiding any contract Lacy has signed with any competing promoter; iii) declaring the promotion agreement valid and the notice of termination null and void and iv) awarding damages costs and counsel fees.

Count II naming only John Does and Richard Roes asserts tortious interference with contract and prospective economic advantage claims. Count III seeks judgment declaring that the promotion agreement is valid. Lacy removed the cased to the federal court on the ground of diversity of citizenship. I have found that plaintiffs' purported dismissal of the action was ineffective by reason of Lacy's prior service of an answer. Consequently, the applications for emergent relief are being heard in this court.

## II. Discussion

The court has jurisdiction by virtue of the diversity of citizenship of the parties and by virtue of the amount in controversy.

The standards for granting preliminary injunctive relief are well established in this circuit.

7

Plaintiff must show: i) a reasonable probability of success on the merits, ii) that the plaintiff will be irreparably injured by denial of relief; iii) that granting preliminary relief will not result in greater harm to the other party or third parties, and iv) that granting such relief is in the public interest. See, e.g., Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F. 2d 797, 800 (3d Cir. 1989).

A. The Merits: The merits of Count I of the complaint (the only Count now in issue) depend entirely upon the meaning of Paragraph 11 of the promotion agreement. Very simply, if termination by Lacy is authorized when either Duva or Shaw departs from Main Events, Lacy prevails on the merits. If termination is authorized only if both Duva and Shaw depart from Main Events, Main Events prevails on the merits. Under the terms of the promotion agreement New Jersey substantive law governs this case.

If the language of a contract is unambiguous, the subjective intent of the parties when they negotiated the contract is irrelevant. Courts look to the objective intent manifested in the language of a contract. The words used in a contract must be given their plain and ordinary meaning. When a contract is unambiguous, "there is no room for interpretation or construction and the courts must enforce those terms as written." Karl's Sales & Serv. Inc. v. Gimbel Bros., Inc., 249 N.J. Super. 487, 493 (App. Div. 1991)

Each party argues that the language of paragraph 11 is unambiguous and supports its position. The critical language is: "In the event both Kathy Duva and Gary Shaw are no longer involved in the management of PROMOTER, FIGHTER may terminate this contract within fourteen (14) days of such event."

To support its position that both Kathy Duva and Gary Shaw must no longer be involved

8

in the management of Main Events for Lacy to have the right to terminate his contractual

obligations, Main Events cites <u>Webster's Ninth New College Dictionary</u> 170 which defines

"both" as meaning "the one as well as the other." Main Events points out that to support Lacy's

contention the agreement would have had to have provided that Lacy could terminate the

agreement upon either Duva or Shaw no longer being involved. The dictionary they cite defines

"either" as meaning "the one or the other."

      Lacy advances several grounds to support his argument that his right to terminate is

triggered if either Duva or Shaw ceases to be involved in the management of Main Events.

      First, Lacy notes the language of paragraph 11 in its entirety, not just the last sentence in

isolation. The first sentence states that nothing in the agreement prevents Main Events from

engaging in a public offering, joint venture or syndication so long as "the present management

team [of Main Events] continues to retain promotional control over the obligations imposed by

this contract." According to Lacy, Shaw and Duva were the "present management team." The

loss of one or the other would result in the termination of the management team's promotional

control, because the team would no longer exist.

      Lacy argues that it would be totally irrational to provide a different result in the

succeeding paragraph of agreement paragraph 11 by giving "both" a meaning which would

permit termination only if the entire management team of Duva and Shaw were to lose

promotional control of Main Events. In other words, a term or provision must be read so as to be

consistent with and make sense within the contract as a whole. <u>See Joseph Hilton & Assocs.,</u>

<u>Inc. v. Evans</u>, 201 N.J. Super 156, 171 (App. Div.), <u>cert</u>. <u>denied,</u> 10 N.J. 326 (1985). It makes no

sense, according to Lacy, to insist "upon the 'management team' only in the limited

circumstances of a public offering, joint venture or syndication, but not, for example, in the event of a sale of the company to a third party" (Lacy's Memorandum of Law in Opposition to Plaintiff's Application at p.15) or in the event of the departure of a team member as in the present case.

Second, Lacy relies on the legal principle that any ambiguity in a contract should be construed strictly against the drafter (Main Events's English in this case). Karl's Sales & Servs., Inc. v. Gimbel Bros., Inc., 249 N.J. Super. 487, 493 (App. Div. 1991).

Third, Lacy points out that the outcome for which Main Events contends could have been made perfectly clear had English drafted the added paragraph using the words "neither-nor", i.e., "In the event that neither Kathy Duva nor Gary Shaw is [] involved in the management of PROMOTER, FIGHTER may terminate . . .".

Were it necessary for me to rely on the language of the agreement above, I would be inclined to conclude that Lacy's position is more persuasive, particularly if the disputed provision is read in light of the language of the first paragraph of paragraph 11 which proceeds it. However, Main Events's interpretation is arguably reasonable. The agreement did not use the "either-or" or "neither-nor" language which would have rendered the pertinent sentence unambiguous. Instead it used the word "both" which creates the interpretive problems encountered here. Further "management team" is ambiguous. Main Events had a number of managerial personnel in addition to Duva and Shaw, i) a travel coordinator who arranged for travel and hotels, ii) a talent relations person who attended to the needs of the fighters, iii) a public relations officer who aggressively marketed the fighters, iv) a comptroller who, among other duties, advised fighters about their financial affairs, v) an operations person who arranged

for all of the details of a fight, vi) a director of boxing who chooses opponents who will make a boxer look good and arranges for sparring partners and training places, and vii) outside counsel, namely Mr. English. Thus it cannot be said with certainty that the reference to "management team" includes only Duva and Shaw. Thus an ambiguity exists that requires that extrinsic evidence be considered. In re New Valley Corp., 89 F. 3d 143, 150 (3d Cir. 1996), cert. denied, 519 U.S. 1110 (1997). The extrinsic evidence in this case consists of the successive drafts of the agreements and the testimony of the persons who negotiated the agreements - Wilkes and English.

As recited above, the critical testimony of Wilkes and English is in conflict. The circumstances of the negotiations are such that misunderstanding could well have arisen. They were conducted in a public area of a busy hotel when each was attending a major bout. Wilkes had a passionately held interest in Lacy's welfare; English, judging from his manner of testifying, is extremely voluble. Were it necessary to determine where the extrinsic evidence led, I would be inclined to find that it favored Main Events's position. It seems irrational to conclude that English, having rejected a key-man provision with respect to Shaw alone would have agreed to a key-man [key-woman] provision for two people, one for Shaw and one for Duva.

It is unnecessary, however, to make this determination, because preliminary injunctive relief must be denied on other grounds, namely, failure to establish irreparable injury. The meaning of the ambiguous language of the agreement can be left to a jury's determination. This is particularly appropriate where a credibility finding must be made.

Having concluded that there is a jury question, it follows that each party's motion for summary judgment must be denied.

11

B. Weighing the Equities: Main Events has advanced a number of reasons why it would be irreparably injured if it does not obtain preliminary injunctive relief. First, it points to Paragraph 10 of the agreement which reads:

### 10.  UNIQUE SERVICES

FIGHTER acknowledges and agrees that the services to be rendered or furnished by FIGHTER are of special, unique, unusual and extraordinary character, giving them peculiar value which cannot be reasonably or adequately compensated in action at law and could cause PROMOTER irreparable damage and injury.

Second, Main Events enumerates the factors that make Lacy unique. He is ranked #9 with the USBA and #14 with the IBF, with higher rankings to come with Main Events's promotional efforts. He is an Olympian boxer and has been packaged with other Olympians to his benefit to advance his career.

Third, Main Events has entered into substantial commitments based upon its contract with Lacy, including commitments to a major broadcast network. Inability of Main Events to keep its commitments will cause Main Events reputational injury. In particular it would appear that Main Events has an agreement with Showtime to produce a group of "Olympian" boxers which includes Lacy. Main Events cites, among other cases, Arias v. Solis, 754 F. Supp. 290 (E.D.N.Y. 1991); Madison Square Garden Corp. v. Carnera, 52 F. 2d 47 (2d Cir. 1931); Lewis v. Rahman, 147 F. Supp. 2d 225 (S.D.N.Y. 2001); and Madison Square Garden Boxing, Inc. v. Shavers, 434 F. Supp. 449 (S.D.N.Y. 1977).

In her testimony Duva and other Main Events witnesses advanced three reasons why Lacy's departure would cause Main Events irreparable injury: i) Main Events's reputation would suffer as it would be viewed as a promoter which could not deliver on its commitments; ii) its

12

Olympic program would suffer because previously it had five Olympians available and now only has four, making it more difficult to produce the requisite number of such fighters for particular events; iii) Lacy is unique in that he has superstar quality and a charismatic personality. He can deliver a knock-out punch and is utterly fearless. To this English added in his testimony that permitting Lacy to go elsewhere would have a devastating effect on the morale of the Main Events team, which works tirelessly to advance the careers of its boxers. The team members would be demoralized if a fighter in whom they had invested time and energy in reliance upon his agreement to fulfill his role walked away from his commitment.

Although eloquently expressed, these risks do not appear to be of major significance. Other fighters have left Main Events without serious adverse consequences. Although he is a promising boxer, Lacy is not a world champion and, according to Duva, will not be ready for a championship fight for six months. He has not been the main event in any show. At the time of Lacy's termination Main Events had a roster of twenty-three fighters other than Lacy. Since then it has signed on two new fighters.

Main Events has no long term contracts with foreign broadcasters to produce Lacy; none has stated it is less willing to contract with Main Events because of Lacy's departure. Duva testified that Main Events still has an excellent relationship with HBO from which Main Events derives the largest percent of its income. Main Events had a strained relationship with Showtime before Lacy's departure. Nevertheless, Showtime's Senior Vice President, Kenneth Hershman, testified that Showtime has not declared a breach of any contract as a result of Lacy's departure from Main Events, and Lacy's loss has had no impact upon Main Events's reputation with Showtime.

Lacy advances a number of factors that establish hardship were injunctive relief awarded against him. First, he cites the damage which would be caused to his career. He is twenty-five years of age and would have turned professional years ago had he not wished to compete in the Olympics. His career life is thus shortened and he cannot afford to wait until a final adjudication on the merits to seek another promoter to advance his career in the short time period available to him.

Second, the person at Main Events upon whom he placed most reliance to promote his interests is no longer there, and particularly after the present controversy there is great doubt whether the remainder of the Main Events team would as aggressively pursue his interests.

Third, Lacy characterizes the agreement as one sided. It permits Main Events to terminate it if Lacy loses a single bout. If Lacy is injured or disabled, the agreement is extended by the period of disability, but in the meantime Lacy would receive no income.

Main Events overstates Lacy's criticalness to its operations. While a contract provision such as that contained in Paragraph 10 is some evidence of uniqueness and irreparable injury, it is not controlling upon the court's determination of the appropriateness of a preliminary injunction. Laidlaw, Inc. v. Student Transp. of Am., Inc., 20 F. Supp. 2d 727, 758 (D.N.J. 1998). Lacy is a talented boxer who evidently has progressed satisfactorily while Main Events promoted him, but he is not yet a champion boxer. Evidently Main Events can readily replace him in bouts as demonstrated by Main Events's failing to request that he engage in the July 13 New Jersey Sports fight and replacing him with another fighter.

Main Events has not set forth specific information about commitments it has made which depend upon Lacy being available to it. Nor has it set forth information as to how Lacy's

14

unavailability will cause it to violate agreements with Showtime or other broadcasters.

The likelihood of Lacy's departure having a damaging effect on Main Events's reputation is highly speculative. If in fact Lacy's termination of the promotion agreement is wrongful, Main Events's injuries can be remedied by money damages, which should be capable of computation relatively easily in the circumstances of this case. Apparently the Showtime arrangement contemplates a specific reduction in the amount of the fee Main Events will or did receive in the unlikely event that Main Events will not be able to produce the requisite number of Olympians. The promotion agreement itself provides for the amount of the payments to which Main Events is entitled in various circumstances. If Lacy wrongfully terminated the agreement and fights under another promoter or as his own promoter it should not be a difficult task to determine what Main Events would have received had Lacy been boxing under its auspices.

On the other hand, to interrupt Lacy's boxing career at this critical point could have devastating and irreparable consequences. Given the relatively short term of such a career, any significant interruption would be likely to cause irreparable injury. To force him to continue his association with Main Events in the absence of the executive in whom he had most confidence also would threaten his career. The agreement by its very terms requires the good faith participation in multiple decisions by both parties. In view of the current controversy it is questionable whether such mutual good faith dealings could be restored.

Thus even if there were a likelihood of success on the merits, the evidence does not establish irreparable injury to Main Events if a preliminary injunction is denied, and it does not establish an absence of irreparable injury to Lacy if a preliminary injunction is granted.

### III. Conclusion

15

For the reasons set forth herein, Main Events's application for a preliminary injunction is denied, and Main Events's and Lacy's motions for summary judgment are denied. An appropriate order will be filed.

DICKINSON R. DEBEVOISE
U.S.S.D.J.

Dated: September 4 , 2002

16